UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND


DORA FIGUEIREDO,
             Plaintiff,

      v.                                    C.A. No. 09-165ML

LIFE INSURANCE COMPANY OF
NORTH AMERICA,
             Defendant.


MEMORANDUM AND ORDER

      The plaintiff in this case, Dora Figueiredo ("Figueiredo"),
challenges the termination of long term disability ("LTD") benefits
under an employee benefit welfare plan.  After removing the case to
federal court pursuant to the Employee Retirement Income Security
Act of 1974, 29 U.S.C. §§ 100 et seq. ("ERISA"), the defendant,
Life Insurance Company of North America ("LINA") filed a motion for
summary judgment, to which Figueiredo responded with a cross motion
for summary judgment.  Upon review of the parties' memoranda and
the provisions of the LTD Plan in which Figueiredo was a
participant, this Court determined that LINA's decision to
terminate Figueiredo's benefits is not entitled to deferential
review and that the administrative record will be reviewed de novo.
Figueiredo v. Life Ins. Co. of North America, — F.Supp.2d —, 2010
WL 737652 (D.R.I. 2010).  Accordingly, the parties were instructed

1

to file memoranda to address (1) whether, under *de novo* review, LINA's decision was in error; and (2) what appropriate remedy may be ordered by this Court. Both parties have submitted supplemental memoranda as directed and the Court has conducted a thorough review of the administrative record.  For the reasons set forth below, LINA's motion for summary judgment is DENIED and Figueiredo's motion for summary judgment is GRANTED.

I. Facts

Figueiredo is a 57 year old Rhode Island resident who began employment with Osram Sylvania, Inc. ("Osram") in 1988.  AR 006. As part of her employment benefits, Figueiredo was a participant in Osram's Long Term Disability Plan (the "Plan"). SUF 1.  Osram purchased Group LTD Policy No. LK 030043 (the "Policy") from LINA, effective January 1, 1999, to fund benefits under the Plan. SUF 2, AR 117.

The Policy provides, *inter alia*, that "[s]atisfactory proof of Disability must be provided to the Insurance Company, at the Employee's expense, before benefits will be paid." SUF 10, AR 133. In addition, the Policy states that "Disability Benefits will end . . .[on] [t]he date the Insurance Company determines an Employee is not Disabled." SUF 11, AR 133.  Based on Figueiredo's age at the time she became disabled, any benefit payments to her terminate automatically at age 65.  AR 121.

The Policy provides the following definition of Disability:

2

An Employee is Disabled if, because of Injury or Sickness,

1. he or she is unable to perform all the material duties of his or her regular occupation, or solely due to Injury or Sickness, he or she is unable to earn more than 80% of his or her Indexed Covered Earnings; and

2. after Disability Benefits have been payable for 12 months, he or she is unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience, or solely due to Injury or Sickness, he or she is unable to earn more than 80% of his or her Indexed Covered Earnings. SUF 12, AR 120, 123, 126, 129.

In September 2001, Figueiredo was employed as an "Inspector," which involved sorting and moving inventory in the Osram facility. SUF 3, see AR 644 (describing daily job duties as "fill boxes and put them on trays"). The DOT[1] Occupational Requirements, which define the necessary strength level for the occupation as "light," see SUF 3, further list tasks for the occupation as "Lifting, Carrying, Pushing, Pulling 20 Lbs. occasionally, frequently up to 10 LBS., or negligible amounts constantly. Can include walking and/or standing frequently even though weight is negligible. Can include pushing and/or pulling of arm and leg controls." AR 516. According to Vocational Counselor Joy Sasson, the job "may require physically the ability to carry, push and pull up to 20 lbs., occasionally. This occupation requires the ability to stand or

---

[1]

The Dictionary of Occupational Titles ("DOT") is a standard reference work created by the Employment and Training Administration.

3

walk for prolonged periods of time." AR 78, AR 628. A prior job evaluation by Osram notes that the Job Title of "Inspect and Pack Finished Ware" "[l]ifts up to 40 lbs. on occasion." AR 630. For an "Inspector Packer," standing is required frequently (2.5-5 hours). AR 631.

On September 24, 2001, Figueiredo was seen by her general physician, Dr. Belarmino A. Nunes, M.D. ("Dr. Nunes"), for pain in her left knee and leg. SUF 4, AR 205. On October 11, 2001, Figueiredo underwent an MRI of the left knee, which revealed an "undersurface tear of the posterior horn and body of the lateral meniscus." SUF 5, AR 236. On December 13, 2001, Orthopedic Surgeon Dr. Robert J. Fortuna ("Dr. Fortuna") performed an arthroscopic partial lateral meniscectomy on Figueiredo's left knee. AR 278. Between January and April of 2002, Figueiredo participated in physical therapy with William Hull, MPT ("Hull"), but discontinued following her fourteenth visit after reporting significant pain during the process. AR 283-284.

As a Rhode Island resident, Figueiredo was initially entitled to, and received, state temporary disability benefits. AR 93. On March 1, 2002, Figueiredo filed a claim with LINA for LTD benefits. SUF 7, AR 645-51. On April 30, 2002, Figueiredo received a notification from Cigna Group Insurance ("Cigna")[2] that her claim

---

[2]

    Figueiredo dismissed all claims against Osram and Cigna by stipulation. Stipulation, April 15, 2009 (Doc. # 3).

had been approved, SUF 9, AR 606.  Benefit payments commenced on March 24, 2002.  SUF 8, AR 006.

On April 1, 2002, Figueiredo underwent diagnostic imaging of her right shoulder for pain.  The imaging report showed "no fractures, dislocations, or other bone or joint pathology." AR 230. Records preceding Figueiredo's knee surgery, which precipitated the finding of disability, state that she sought treatment for pain in her right shoulder and left upper back as early as January 24, 2000.  AR 245.  At that time, Figueiredo reported that lifting and pushing increased her pain.  Id.  Figueiredo was prescribed Naproxen, light duty, and six sessions of physical therapy.  AR 246.

On June 1, 2002, a follow-up MRI revealed a new tear of Figueiredo's lateral meniscus.  According to Dr. Fortuna, Figueiredo was "uncertain as to whether or not she want[ed] to proceed with arthroscopy at the present time." AR 266.  Figueiredo sought a second opinion with Dr. Hirsch, who suggested that additional surgery might worsen her condition.  AR 74.

For the next three years, Figueiredo saw Dr. Fortuna on about 30 occasions for varying complaints, including continuing difficulties with her knee, severe neck and arm pain, weakness of grip in the right hand, and numbness in the left leg.  See Dr. Fortuna's Office Notes from November 12, 2001 through March 25, 2005.  AR 263-66.

5

On May 22, 2002, Cigna informed Figueiredo that the Plan required her to apply for Social Security Disability Insurance ("SSDI"). AR 593. Cigna also advised her that, if she chose not to apply for SSDI benefits, the Plan "allows for a reduction of your Long Term Disability benefits by an amount estimated that you would be eligible to receive." Id. (Emphasis in original). The Plan also provides "for a reduction of your monthly benefits by any Social Security benefits paid for that same period." AR 607. On July 25, 2002, Figueiredo was awarded SSDI payments. AR 97. The SSDI Award Notice states that Figueiredo became disabled on September 24, 2001. AR 588. Because she had to be "disabled for 5 full calendar months in a row before [she was] entitled to benefits," Figueiredo's first month of entitlement was March 2002.[3]

After continuing to complain of pain in her shoulders, Figueiredo underwent diagnostic imaging of her spine and right shoulder on November 25, 2002. No fractures, dislocations or other bone or joint pathology were detected on the shoulder imaging. AR 449. However, the diagnostic imaging report of Figueiredo's spine revealed that she suffers from a "degenerated C6-7 disc." AR 224. According to interpreting physician Dr. Richard Anderson, the "C6-7 disc is moderately narrowed with small associated marginal osteophytes. The associated neural foramina are mildly narrowed

---

[3] Once Figueiredo became eligible for SSDI, LINA's benefit payments to Figueiredo were limited to $100 monthly payments, the minimum coverage. See e.g. AR 532, AR 606.

bilaterally.   Other discs and vertebral bodies are maintained in height. Alignment is anatomic." AR 224, AR 276.

A Physical Ability Assessment Form("PAA Form") provided by Dr. Fortuna to Cigna on April 22, 2002 states that, in an 8-hour worday, Figueiredo can occasionally (<2.5 hours) lift or carry 10 pounds and that she can sit, stand, walk, or climb regular stairs occasionally.   AR 621. Dr. Fortuna noted that Figueirdo cannot stoop at all and that she is unable to kneel, crouch, or crawl. AR 622.   He confirmed that Figueiredo is able to reach overhead, at desk level, and below the waist, and that she is capable of fine manipulation and simple and firm grasps with either hand.  AR 622.

At a December 30, 2002 office visit, Figueiredo reported increasingly severe neck and right arm pain.   A physical exam reveals that she has "significant difficulty moving her neck" and is "barely able to perform any extension whatsoever.   Forward flexion is not too bad.   With lateral bending, she is reporting numbness developing in the right hand."   AR 372. An x-ray shows that Figueiredo suffers from degenerative disc disease at C6-C7, and a subsequent MRI shows central disc herniation at C5-C6, as well as "some foraminal stenosis on that side at multiple levels." AR 265.   The January 9, 2003 MRI report notes "[m]ild degenerative change in the cervical spine with mild to moderate foraminal narrowing as well as mild central stenosis at C5-6 and C6-7 as described."   AR 274.   Dr. Fortuna prescribed physical therapy for

7

Figueiredo and various pain medications, including Tylenol # 3, Vicodin, Celebrex, and Vioxx. Id.  At the same time, Figueiredo continued to see Dr. Nunes on approximately a dozen occasions for varying complaints, including persistent headaches, continuing problems with her left knee, neck pain, and right arm pain.  AR 185 -207.

On January 2, 2003, Dr. Fortuna submitted additional information per LINA's request, which confirmed a diagnosis of cervical radiculopathy with symptoms of severe arm and neck pain. At the time, Figueiredo was prescribed Vicodin for pain and was scheduled for an MRI of the cervical spine.  AR 554.  Office notes by Dr. Fortuna from  February 6, 2003 state that Figueiredo has experienced no relief from physical therapy and that she is still experiencing "significant radicular complaints down the right arm." AR 265.

On February 20, 2003, Figueiredo consulted with Neurologist Dr. Barry L. Levin, M.D. ("Dr. Levin") for "right arm pain and numbness."  AR 222.  According to the Electrodiagnostic Report, Figueiredo suffered from "intermittent pain in the right upper extremity, radiating from the shoulder to the lateral arm, dorsal forearm thumb. She also reported numbness in the same area and a feeling of weakness in her right hand."  AR 222.  Dr. Levin was unable to perform a complete EMG [electromyogram] study on Figueiredo "due to poor tolerance of EMG study and patient

requesting that study be terminated." AR 223.  Dr. Levin informed Dr. Fortuna that "no evidence of neuropathy or radiculopathy was seen," and that Figueiredo's history was "suggestive of cervical radiculopathy."  AR 271.

Figueiredo then participated in at least eight additional physical therapy sessions with Hull in February and April 2003 after being diagnosed with herniated C6-C7.  AR 285-286.  Hull's notes at that time reflect that Figueiredo was experiencing reduced grip strength and occasional difficulty using her arm, as well as intermittent numbness along the radial side of the thumb.  AR 285. Around that time, Figueiredo also began using a cervical traction unit at home.  AR 286, 541.

On April 11, 2003, LINA informed Figueiredo that it was "unable to consider benefits at this time."  SUF 17, AR 545.  The letter explained that LINA had requested medical information from Dr. Fortuna on March 21, 2003 and that, if no current information were received by April 4, 2003, a determination would be based on information already available on file.  AR 548.  After the requested information was submitted, LINA reopened Figueiredo's file and continued to pay benefits.  SUF 18, AR 532.  As before, LINA requested that Figueiredo and her physicians continue to provide updated medical information and/or disability questionnaires to allow for a periodic determination of Figueiredo's status.  SUF 19, AR 481, 509, 524, 531.

On December 10, 2003, Dr. Fortuna submitted a Follow-Up Medical Request Form on which he stated that Figueiredo was "unable to do any lifting of any kind no over head work." Although he responded in the affirmative to the question "Do you expect functional deficits to prevent your patient from performing essential job functions?" he also noted that she could perform "sedentary work only [illegible] pain & numbness." AR 528.[4]

In August 2005, Dr. Fortuna submitted an updated PAA Form, which provides a grid to indicate whether "[t]hroughout an 8-hour workday, the patient can tolerate, with positional changes and meal breaks, the following activities for the specified duration." AR 482. Dr. Fortuna concluded that Figueiredo was able to perform fine manipulation, simple grasp, and firm grasp "continuously" (defined as 67-100% - 5.5+ hours). SUF 20, AR 482. According to Dr. Fortuna, Figueiredo was also able to sit "frequently" (defined as 34-66% - 2.5-5.5 hours); stand, walk, and reach at desk level or below the waist "occasionally" (defined as 1-33% or <2.5 hours); lift or carry 10 lbs. frequently; and lift or carry 20 lbs. occasionally. AR 482.

Dr. Nunes' assessment of Figueiredo's physical abilities was

---

[4]

The information provided by Dr. Fortuna on this form is somewhat ambiguous. Although he checked "Yes" for the question "Could your patient return to work at this time if accommodations were made for the listed restrictions?," he then proceeded to respond to the "If no, why not?" follow-up question. He also stated that it was "unknown" when his patient could return to work. AR 528.

decidedly lower.   According to his August 22, 2005 PAA Form, with the exception of frequently performing simple or firm grasp with the left hand, Figueiredo could only occasionally stand, walk, reach or perform any of the other listed tasks. AR 489.   With respect to "Sitting," Dr. Nunes checked the option of "Not applicable to diagnosis(es)." AR 489.   He also noted that he could not determine whether Figueiredo was capable of fine manipulation with her left hand. Id.

A further MRI performed on November 9, 2005 revealed "[n]o evidence of frank disk herniation," but resulted in an impression of "[l]umbar discogenic change with disc bulges at L4-5 and L3-4 lateralizing to the right side. Mild central stenosis and mild right greater than left neural foraminal narrowing as described." AR 262.

Figueiredo was again evaluated for physical therapy on February 14, 2006 by physical therapist Stevan Simon ("Simon"), who detailed in his assessment the limitations on Figueiredo's range of motion and associated reports of pain.   AR 395.   Simon's PT evaluation states that Figueiredo suffers from "chronic low back pain with sciatic pain in the lower extremity." AR 395. Simon describes Figueiredo's limitations in movement and notes that "[m]uscle testing was not done due to severe guarding and pain reported." AR 395. Simon concludes that Figueiredo would benefit from short term therapy to alleviate her symptoms and improve her

overall mobility, but that her "[p]rognosis is guarded at best, given the chronicity of the problem." AR 395. Figueiredo participated in physical therapy with Simon for about four weeks during which her mobility showed some improvement. However, Figueiredo reported throughout the month that she was experiencing continuing pain. AR 396-398.

Based on the information provided on the PAA forms and other submitted documentation, LINA advised Figueiredo by letter dated January 17, 2006 that her LTD benefits were discontinued as of December 23, 2005. SUF 21, AR 473. The letter states that Figueiredo has the "functional capacity" to work in her occupation and that the evidence does not support her inability to perform her occupation. AR 475. LINA also advised Figueiredo that she could appeal the termination of her LTD benefits and that LINA "would be happy to consider any medical evidence which supports your total disability," including medical records for the period between January 2005 and January 2006. SUF 22, AR 475.

Figueiredo notified LINA through her attorney by letter dated April 11, 2006 that she wished to appeal LINA's decision and provided all medical reports she had received from Drs. Fortuna and Nunes. SUF 23, AR 364. LINA again reviewed Figueiredo's file and, after again determining that the information did not support a reopening of the claim, forwarded the file to a LINA appeals unit. SUF 24, AR 363. Shortly thereafter, on May 24, 2006, Dr. Fortuna

performed an arthroscopic partial lateral meniscectomy and arthrotomy on Figueiredo's left knee in order to excise a meniscal cyst. SUF 25, AR 256.

In connection with Figueiredo's appeal to LINA, Figueiredo's medical information was reviewed by an independent physician, Dr. Maria Hatam ("Dr. Hatam"). SUF 26, AR 337. Dr. Hatam's June 8, 2006 report states that Figueiredo's C spine MRI from November 2005 showed minimal right lower lumbar changes, but that no invasive treatment was recommended. It also notes that Figueiredo was diagnosed with trochanteric bursitis [painful inflammation in the hip area] and a left knee meniscal cyst and possible meniscal tear, but that surgery was not done until May 2006. AR 25, AR 337. Dr. Hatam concluded that "[t]he medical information provided supports [restrictions and limitations] for sedentary level impairment but not light level due to [left] knee meniscal changes." AR 337.

Next, LINA requested a Transferable Skills Analysis ("TSA") to determine "what occupations Ms. Figueiredo is qualified and able to perform." AR 331, SUF 27. According to the TSA, Figueiredo suffered from "Back and Neck pain, DDD [degenerative disk disease], DJD [degenerative joint disease]," and was "[a]ble to perform at the Sedentary physical demand level." AR 331. Based on those identified limitations and her transferable skills and wage requirement, it was concluded that Figueiredo could perform the job of dowel inspector, nut sorter, tablet tester, or table worker. Id.

13

All four of those occupations are described as "sedentary" and require a worker to "[p]erform repetitive or short-cycle work, make judgments and decisions, attain precise set limits, tolerance and standards, compare data, take instructions and handle things."  AR 331.  It is unstated to what extent reaching, grasping, lifting, and/or manipulation is required for either of those occupations.

LINA's records from that time period reflect that "ov [office visit] notes indicate [claimant] continues to have back pain continueing [sic] down right leg down to foot" and that Figueiredo underwent surgery on May 27 [sic], 2006 for lateral meniscal tear and anterior meniscal cyst.  AR 38.  Based on Dr. Hatam's determination that Figueiredo was precluded from functioning in a light capacity, but not in a sedentary capacity, and the four possible occupations identified by the TSA, LINA affirmed the prior denial of Figueiredo's claim.  AR 38.

LINA informed Figueiredo by letter dated June 20, 2006 that, after careful review, the denial of her claim was affirmed.  SUF 29, AR 158-60.  The letter also noted that, although Figueiredo underwent knee surgery in May 2006, "this surgery took place almost five months after her Disability benefits ended and therefore does not provide evidence of continuous Disability going back to December 23, 2005."  Because Figueiredo's disability coverage terminated when her disability benefits ended, "as of May 2006, Ms. Figueiredo was no longer covered under [the Plan]."  AR 159.

On July 18, 2006, Figueiredo again appealed the decision and advised LINA that she would provide additional medical information supporting her claim "in the near future." SUF 30, 31, AR 301-303. Figueiredo then traveled to Portugal for two months, SUF 32, AR 258, and LINA requested additional medical information. SUF 33, AR 300. Figueiredo submitted a February 23, 2007 letter from Dr. Fortuna stating that she had been "continuously disabled from any occupation specifically from 12/23/05 but has been totally disabled actually much before that." AR 255. Although Figueiredo's February 2007 request for voluntary appeal was apparently made outside the stated appeal window, LINA accepted the appeal and forwarded the file to LINA's Appeals Team. SUF 34, AR 156-57.

On April 5, 2007, LINA upheld its decision to terminate Figueiredo's LTD benefits. SUF 36, AR 153-55. The denial notes LINA's receipt of a letter from Dr. Fortuna indicating that Figueiredo had been continuously disabled since before December 23, 2005. Nevertheless, LINA concluded that "[t]he medical information reviewed does not provide evidence of functional deficits by clinically measurable testing such as validated range of motion or strength measurement which supports restrictions from December 24, 2005 forward." AR 154. LINA acknowledged that Figueiredo "would not have been able to perform her occupation when she underwent knee surgery in May of 2006," but maintained that "the documentation on file does not provide evidence of continuous

15

functional deficits that would have prevented her from performing any occupation from December 23, 2005 to the time of surgery." SUF 37, AR 154. LINA's records acknowledged that, according to Figueiredo's PE [physical examination] provider, she suffered from "weakness of left hand and cant [sic] hold heavy objects and severe impingment [sic] on rt."[5] AR 18, AR 19. Dr. Nunes's assessment from January 30, 2006, on which this notation in LINA's records is based, also makes reference to severe pain of the cervical spine and both shoulders. AR 169. LINA noted further that "there is lack of measured rom [range of motion] and strength noted to support [claimant's] complaint and any weakness found by provider." AR 18, AR 19.

In the month following LINA's denial, Figueiredo submitted identical affidavits from Dr. Fortuna and Dr. Nunes, which stated that, "based on a reasonable degree of medical certainty [] the patient has been continuously disabled from any occupation specifically from 12/23/05 but has been totally disabled actually much before that." SUF 38, AR 174, 254. In a letter dated May 2, 2007, Dr. Nunes concluded that "Mrs. Figueiredo is totally disabled and incapable of any gainful employment due to a degenerated C6-7 disc." AR 175. In his letter, Dr. Nunes also provided information regarding the three last visits Figueiredo made to his office. AR

---

[5]
According to her Disabilities Questionnaire, Figueiredo is right-handed. AR 603.

175, AR 181.   According to Dr. Nunes, an April 24, 2006 "physical examination revealed cervical spine pain upon palpitation and all motion."  On November 27, 2006, Figueiredo consulted him again with complaints of "upper and lower back pain, bilateral shoulder arm and hand pain."  AR 175, AR 181.

LINA again reviewed Figueiredo's file and issued a final denial by letter dated June 6, 2007.  SUF 39, AR 149. As one of the grounds for its denial, LINA expressed that "[t]he medical documentation reviewed does not provide evidence of functional deficits by clinically measurable testing."  AR 149.   The June 6, 2007 letter, as all of the denial letters before it, advised Figueiredo that she had "a right to bring legal action regarding her claim under the ERISA section 502(a)."  AR 149.   On December 18, 2008, Figueiredo filed her claim for LTD benefits in Rhode Island Superior Court, which LINA removed based on ERISA preemption. SUF 40, 41.

On December 29, 2009, this Court conducted a hearing on the parties' cross motions for summary judgment.    Following the hearing, the Court directed the parties to file short memoranda addressing the question of which standard of review the Court should employ in considering the parties' motions.  LINA filed a supplemental memorandum on January 19, 2010 and Figueiredo responded with a memorandum in opposition on January 26, 2010.

After considering the parties' memoranda, the Court determined

17

that the Plan's provision that "satisfactory proof of disability must be provided to the Insurance Company" was insufficient to convey discretionary authority on LINA because it failed to indicate to whom such proof must be satisfactory. Accordingly, the Court issued a Memorandum and Order on March 1, 2010, advising the parties that it would conduct a *de novo* review of LINA's decision to terminate Figueiredo's benefits. <u>Figueiredo v. Life Ins. Co. of North America</u>, —F.Supp.2d —, 2010 WL 737652 (D.R.I. 2010). The Court also instructed the parties to file additional memoranda to address "(1) whether, when viewed under the *de novo* standard deemed applicable in this matter, LINA's termination of Figueiredo's long term disability benefits was in error; and (2) if such termination was in error, what appropriate remedy may be ordered by this Court." <u>Id.</u> at *6. Both parties filed memoranda as instructed.[6]

## II. Standard of Review

As previously determined by this Court, the appropriate standard of review in this case is *de novo*. In a *de novo* review, the Court independently weighs the facts and opinions in the administrative record to determine whether the claimant has met his or her burden of showing that he or she is disabled as defined by the plan at issue. <u>Orndorf v. Paul Revere Life Ins. Co.</u>, 404 F.3d

---

[6]

The Court notes that LINA primarily renewed its argument for application of deferential review and took no position on what remedy this Court may order, should the termination of benefits be deemed erroneous.

510, 518 (1st Cir. 2005). "While the court does not ignore facts in the record, see Recupero v. New Eng. Tel. & Tel. Co., 118 F.3d 820, 830 (1st Cir. 1997), the court grants no deference to administrators' opinions or conclusions based on these facts." Id. In other words, the Court stands "in the shoes of the administrator to 'determine . . . whether the administrative decision was correct.'" Richards v. Hewlett-Packard Corp., 592 F.3d 232, 239 (1st Cir. 2010)(quoting Few v. Liberty Mutual Ins. Co., No. 06-CV-00427-JL, 2009 WL 756211 (D.N.H. March 19, 2009)).

In evaluating a motion for summary judgment regarding the denial of benefits under ERISA, "the non-moving party is not entitled to the usual inferences in its favor." Orndorf v. Paul Revere Life Ins. Co., 404 F.3d at 517. Instead, "summary judgment is simply a vehicle for deciding the issue." Id. The First Circuit has established that the "guiding principle in conducting de novo review is that it is the plaintiff who bears the burden of proving he [or she] is disabled." Id. at 518, 519 (citing Terry v. Bayer, 145 F.3d 28, 34 (1st Cir. 1998)(burden rests on the insured to make a showing sufficient to establish a violation of ERISA)). In this case, pursuant to the terms of the Plan, Figueiredo's burden is to prove that she is "unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience."

III.  Discussion

LINA asserts in its memorandum that "the plaintiff's burden was to provide satisfactory proof" that she was unable to perform any occupation "because of the injury to her left knee." LINA's Supp. Mem. 8. That statement would suggest that Figueiredo's claim is limited to only the injury which initially qualified her for LTD benefits. The Plan, however, imposes no such specific requirement. If Figueiredo demonstrates that, while she was deemed disabled under the Plan, she incurred or was diagnosed with another disabling condition that precluded her from performing "all the material duties of any occupation," she is entitled to continuing benefits.

The record submitted to LINA regarding Figueiredo's medical problems is voluminous and consistent. It reveals that, even before Figueiredo underwent surgery for a meniscal tear in her left knee in October 2001, she sought treatment for pain in her right shoulder and upper back and reported that lifting and pushing increased her pain. Within six months of her initial surgery, Figueiredo suffered another meniscal tear which resulted in continuing leg pain. Figueiredo decided not to undergo additional surgery at that time after receiving a second opinion advising her that such surgery might worsen her condition. Based on the documentation Figueiredo submitted, she continued to have difficulties with her left knee and leg until she finally had a second surgery in May 2006 to address a meniscal cyst and the

20

meniscal tear in her left knee.

As Figueiredo continued to complain of pain in her shoulders and back, she was eventually diagnosed with cervical radiculopathy involving several spinal discs. The record is replete with evidence that Figueiredo sought to alleviate the pain and improve her condition, but that she consistently reported experiencing severe pain and continuing difficulties with reaching, grasping, and lifting. Over the course of her treatment, Figueiredo consulted Dr. Fortuna on about 30 occasions, and Dr. Nunes on at least a dozen occasions. Although she also presented with a number of unrelated health issues, the increasing neck and arm pain, together with difficulties in movement and resulting numbness predominate. In the course of diagnosis and treatment, Figueiredo submitted to numerous x-rays and MRIs, all of which confirmed a finding of degenerative changes. She also consulted a neurologist, but was unable to endure a complete electrodiagnostic examination because of the pain.

Figueiredo was prescribed significant pain medication including Tylenol #3, Vicodin, Celebrex, and Vioxx. In addition, Figueiredo participated in at least three series of physical therapy, initially related to her knee, and subsequently, after being diagnosed with herniated C6-C7. The PT report from Spring 2003 is consistent with office notes from Figueiredo's physicians, reflecting Figueiredo's continuing difficulties with using her arm, reduced grip strength, as well as severe shoulder and neck pain and

impaired range of motion.

Figueiredo's claims regarding the pain in her neck and shoulders are well supported by medical imaging. An MRI taken in November 2002 shows a degenerated C6 - C7 disc; a later x-ray supports that finding; a January 2003 MRI report reveals degenerative changes to Figueiredo's cervical spine; a November, 2005 MRI confirms central stenosis and foraminal narrowing. While the degeneration of Figueiredo's cervical spine is described as "mild" or "mild to moderate," she consistently reported severe arm and neck pain as a result. In addition, Figueiredo continued to suffer from leg pain related to the lateral meniscal tear in her left knee, for which she eventually underwent surgery in May 2006.

Although LINA's records reflect that it was aware of Figueiredo's arm and neck pain and her related weakness of grasping or holding of objects, the focus of LINA's assessment appears to have been on Figueiredo's knee injury, for which she was initially found disabled. LINA's identification of four possible jobs Figueiredo could perform appears primarily based on the fact that those occupations were "sedentary." The descriptions of dowel inspector, nut sorter, tablet tester, or table worker lack any specific or quantitative description of the actual movements required for the work, nor does the TSA take into consideration that Figueiredo had difficulties grasping and suffered from weakness in her arm(s).

LINA's denial of Figueiredo's benefits acknowledges that, when

Figueiredo underwent knee surgery in May of 2006, "she would not have been able to perform her occupation."   LINA maintained, however, that Figueiredo failed to "provide evidence of continuous functional deficits that would have prevented her from performing any occupation from December 23, 2005 to the time of surgery." LINA also asserted that the May 2006 surgery "does not provide evidence of continuous Disability going back to December 23, 2005," when she was deemed to be no longer disabled.

A review of the record reveals that Figueiredo suffered a meniscal tear in her left knee shortly after her first surgery and that she complained of pain in her left leg thereafter.  Moreover, all MRIs, including one performed in November 2005, support a finding of degenerative change in Figueiredo's cervical spine. Dr. Nunes, who examined Figueiredo in January 2006, notes that Figueiredo suffered from severe neck and arm pain. February 2006 PT notes from Figueiredo's physical therapist detail Figueiredo's limitations on her range of motion and document Figueiredo's report of pain during the therapy. A physical examination by Dr. Nunes in April 2006 also reveals "cervical spine pain upon palpitation and all motion."   In sum, the record relative to the time period between December 2005 and May 2006 indicates that Figueiredo's disability continued beyond December 2005 because her condition, both with respect to her left knee and the degeneration of her cervical spine, had not improved over time.

As LINA points out in its memorandum, the First Circuit has

consistently held that "benefits eligibility determinations by the Social Security Administration ["SSA"] are not binding on disability insurers." <u>Pari-Fasano v. ITT Hartford Life and Acc. Ins. Co.</u>, 230 F.3d 415, 420 (1st Cir. 2000); <u>Morales-Alejandro v. Med. Card System, Inc.</u>, 486 F.3d 693, 699 (1st Cir. 2007). Although an award of Social Security benefits may be relevant in reviewing the eligibility determination of a private insurer, unless the insurer's plan sets forth criteria identical to those employed by the SSA, "it should not be given controlling weight." <u>Pari-Fasano</u>, 486 F.3d at 420.

In the case before the Court, the SSA determined that Figueiredo became disabled on September 24, 2001. LINA approved Figueiredo for LTD benefits effective March 24, 2002, and continued to approve her for benefits until December 23, 2005. After that date, LINA determined that Figueiredo was no longer disabled because she had the "functional capacity" to perform a sedentary occupation and because it deemed the evidence submitted by her insufficient to demonstrate disability. Although Dr. Nunes reported that Figueiredo was found to be "totally disabled" by SSDI, <u>see</u> AR 488, there is no evidence in the record that the SSA ever reviewed and/or confirmed Figueiredo's disability status.

However, even without consideration of the disability determination by the SSA, this Court is of the opinion that the administrative record amply supports Figueiredo's claim for disability. The overall picture is that of a patient who consulted

several physicians and specialists on numerous occasions and who underwent both diagnostic procedures and repeated attempts at physical therapy to find relief from persistent and severe pain resulting from degenerative changes in her cervical spine and recurring knee injuries.

## IV.  Remedy

The Court has "considerable discretion" in formulating a remedy if it determines that the termination of disability benefit was in error.  Buffonge v. Prudential Ins. Co. of America, 426 F.3d 20, 31 (1st Cir. 2005)("[T]he court must have 'considerable discretion' to craft a remedy after finding a mistake in the denial of benefits"); Cook v. Liberty Life Assur. Co. of Boston, 320 F.3d 11, 24 (1st Cir. 2003)(court has "discretion to formulate a necessary remedy when it determines that the plan has acted inappropriately").

Generally, a district court will "either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits."  Cook v. Liberty Life Assur. Co. of Boston, 320 F.3d at 24.   If it appears that the insured's disability ended at some time in the past, remand is appropriate because an award of retroactive benefits would result in an economic windfall to the insured.  However, where the insured would have continued to receive the benefits, or where there was no evidence in the record to support a termination or denial of benefits, retroactive reinstatement is appropriate.  Cook, 320 F.3d at 24.

This Court, after conducting a *de novo* review of the administrative record, has determined that Figueiredo was denied benefits to which she was entitled under the Plan. Therefore, it is appropriate to award those benefits to her retroactively and, unless she fails to demonstrate her disability in the future, on a continuing basis. Given that Figueiredo suffers from degenerative changes that cause her disability, it is not likely that such an award will result in an "economic windfall." Moreover, as previously stated, more than 90% of Figueiredo's disability payments are paid by the SSA, whereas LINA only contributes a $100 monthly payment, the minimum amount of coverage under the Plan.

In addition, after Figueiredo's disability benefits have been restored to her, she once again bears the obligation to demonstrate that she is disabled under the terms of the Plan. If she is unable to prove that she cannot perform "any occupation," LINA may pursue termination of Figueiredo's disability status at that time.

### Conclusion

For the reasons stated herein, LINA's motion for summary judgment is DENIED; and Figueiredo's motion for summary judgment is GRANTED.

Figueiredo is awarded disability benefits under the Plan for the period from December 23, 2005 to the date of this Memorandum and Order and continuing until such time as it is determined that she

is no longer eligible for such benefits.


SO ORDERED.



_Mary M. Lisi_
_____

Mary M. Lisi
Chief United States District Judge

June 8 , 2010